UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| CHARLES GRAHAM, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:11-CV-00546 |
| | § | |
| PCL CIVIL CONSTRUCTORS, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM ENTERING
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I. INTRODUCTION

Plaintiff Charles Graham is a commercial reef fisherman and Captain of the wooden fishing vessel M/V ANGELA C.  In March 2011, in Freeport, Texas, two barges owned by Defendant PCL Civil Constructors broke free from their moorings during a storm, drifted down river, and struck the ANGELA C.  The parties settled claims for repairs and storage fees, and PCL admitted liability for other compensatory damages based on its negligence.  The following three issues remained: 1) the amount of Graham's compensatory damages for lost profits, survey fees, emergency repairs, and crew payments; 2) whether PCL was reckless in mooring its barges, and thus should be liable for punitive damages; and 3) whether PCL acted in bad faith in its early negotiations with Graham, such that it should be liable for Graham's initial attorney's fees.

A bench trial was held on September 3–4, 2013 to address these remaining issues. The Court heard live testimony from Captain Graham and two experts— Lemuel Wayne Sanborn, a tug boat captain, and Keith "Buddy" Guindon, a fisherman and seafood wholesaler.  PCL's finance manager, Jason Foglia, also testified on a limited issue.  The parties relied on deposition testimony from PCL employees Greg Grady, Jim Fitzgerald, Adlai Jourdin, and Jason Foglia.

Having considered that testimony, the exhibits, the governing law, and the post-trial briefing, the Court reaches the following conclusions.

First, Graham's lost profits can be estimated with reasonable certainty based on his average daily fishing income in 2011 prior to the incident and his average ratio of operating expenses to fishing income from five years of tax returns.  The emergency repairs were reasonable, uncontroverted, and thus recoverable.  The portion of the survey fees undertaken to determine the extent of the damage to the vessel is also recoverable.  Graham's payment to his crewmember for emergency medical expenses was legally required and thus recoverable.  However, Graham's payments to his crew while they were unemployed were not legally required, and thus are not recoverable.

Second, PCL's conduct was reckless with regard to the moorings of its barges, particularly with a storm pending.  The Court therefore awards punitive damages to Graham.  The Court determines 65% of compensatory damages to be

an appropriate amount of punitive damages given the standard set forth in *Exxon Shipping v. Baker*, 554 U.S. 471, 492–94 (2008).

Third, the evidence does not show that PCL acted in bad faith while initially negotiating with Graham about the costs to repair his boat, and therefore attorney's fees are not warranted.

Accordingly, based on the findings of fact and conclusions of law set out below,[1] the Court:

- awards Graham total compensatory damages of $106,942.65— including $102,710.96 for lost profits, $2,931.69 for survey fees, $1,000 for temporary repairs, and $300 for crew medical expenses;

- awards punitive damages of $69,512.72 to Graham, equal to 65% of total compensatory damages; and

- dismisses Graham's claim for attorney's fees.

## II.   FINDINGS OF FACT

### A.  The Parties

Plaintiff Charles Graham is a commercial reef fisherman who has earned his livelihood from fishing for most of his life since graduating from high school and serving in the military.  Graham Trial Tr. Vol. 1 at 3:14–21 (Docket Entry Nos. 70, 70-1, 70-2).  Graham has owned and operated several fishing boats over the years, working up to the M/V ANGELA C—a  60-foot, deep-draft, wooden-hulled

---

[1] Any findings of fact that are more properly conclusions of law are so deemed. And any conclusions of law that are more properly findings of fact are so deemed.

fishing vessel that is the "top of the line" for offshore, hook-and-line reef fishing. *See id*. at 5:23–6:5, 6:20–7:9.  Since purchasing the ANGELA C in 2008, Graham has invested his profits back into the boat to make many improvements.  *Id.* at 6:23–7:2, 9:23–10:25.

Defendant PCL Civil Constructors, Inc. is in the heavy construction business and specializes in building and repairing bridges.  *See* Grady Dep. at 87:15–88:20 (Pltf. Ex. 112 at 68).  PCL's annual revenue is about 200 million dollars and its net worth is approximately 38 million dollars.  Foglia Dep. at 7:12–16, 8:14–17 (Pltf. Ex. 110 at 28).  PCL employs about 225 salaried employees and about 200 hourly employees.  *Id.* at 6:21–7:3.  It is a subsidiary of PCL Construction Enterprises, Inc., a commercial building construction company.  *Id.* at 7:17–21, 6:6–8.

## B.  The Freeport Project and the Barges

Union Pacific Railroad hired PCL to replace a deteriorating bridge spanning the Brazos River in Freeport.  Grady Dep. at 88:15–20.  Around February 15, 2011, barges loaded with the bridge components were moved from Houma, Louisiana to the Freeport project site.  *See id*. at 10:3–6, 27:1–8.  Greg Grady, the project superintendent for the Freeport Project, was in charge of all field operations.  *See id.* at 9:5–6, 10:14–24.  He has more than forty years of experience in the construction industry and has worked for PCL for twenty-two years.  *See id*. at 7:16–8:7.

When the barges arrived in Freeport, they were moored to H-beam pilings by a single loop of a two-inch thick mooring line. *See id*. at 93:5–96:8; Def. Ex. 19 (sample section of two-inch mooring lines); Pltf. Ex. 40 (see Figure 1 below). In particular, Barge M-8028, a 195-foot steel barge that was loaded with two 350-ton bridge counterweights and several other tower sections, was moored to two steel H-beam pilings. Barge M-304, which carried part of the tower of the bridge, was tied alongside and outside of Barge 8028. The two mooring lines that attached Barge 8028 to the two H-beam pilings thus held the combined load of the counterweight barge and the tower barge. *See generally* Grady Dep. at 23:6–26:12; Fitzgerald Dep. at 17:18–24:13.



**FIGURE 1.** Close-up photo of single line looped around an H-beam (taken by PCL after the incident). Pltf. Ex. 40.

An H-beam piling looks like an "H" from the top and has square edges, rather than rounded edges like a bollard.  *See* Sanborn Tr. at 8:2–9, 8:19–22 (Docket Entry Nos. 67, 67-1); Jourdin Dep. at 37:12–16 (Pltf. Ex. 113 at 42).  PCL superintendent, Adlai Jourdin, said "I tie around H-[beam piling] all the time." Jourdin Dep. at 86:16–20.  Graham's expert, Sanborn, on the other hand, testified that it is "common knowledge within the industry" that "anything other than a rounded edge would . . . create a sharp edge, a knife edge . . . that would cut your line or cable," and that it is "basic safety" to "avoid any sharp edge on any type of mooring device." Sanborn Tr. at 8:7–22.  In his opinion, there are very limited circumstances where a mooring system with H-beam pilings and two-inch ropes would be acceptable to use—only "for a few hours . . . with almost constant supervision" and a with tug boat standing by—otherwise, "the barge is at serious risk of breaking loose." *Id.* at 55:13–56:8.

The evidence indicates that PCL moored the H-beam pilings in a navigable waterway without obtaining a permit, which is required by federal law.  *See* 33 U.S.C. § 403; Docket Entry No. 74 ¶ 123.  Grady testified that he received oral permission from the Coast Guard to place the pilings in the waterway, *see* Grady Dep. at 38:10–24, but Graham credibly argues that this informal "comment in passing" did not satisfy the statutory requirement to obtain a permit from the Army Corps of Engineers.  Docket Entry No. 74 ¶¶ 123–25.

Grady decided how to moor the barges, taking into consideration various factors when making the decision.  Grady Dep. at 93:5–94:7. He considered that this was expected to be a short-term mooring, that the area where the barges were being moored was in fairly protected waters with very limited boat traffic, that the tide action in the area was minimal, and that the area had protection from the wind due to a levee near the riverbank. *See id*. at 59:18–60:12, 65:6–66:1, 93:9–94:3. Based on the foregoing considerations and determinations, Grady concluded that his planned mooring system would be adequate for the task at hand.  *See id*. at 93:9–24.

Grady testified that PCL employees performed "visual inspections [of the moorings] while they were on the barge," but there was no standard protocol for the frequency of these inspections, nor specific consideration given to "how the H-beams would cause the rope lines wrapped around them to wear." *Id.* at 49:1–50:3. Fitzgerald confirmed this testimony, saying that while working on the barges he performed informal visual inspections of the moorings "once or twice a day" from a few feet away, but never made any written report of his findings.  Fitzgerald Dep. at 37:14–24 (Pltf. Ex. 111 at 37).  The mooring lines were not changed during the two to four weeks that the barges were in place prior to the breakaway.  *Id.* at 38:07–14.

### C. The Collision

The breakaway occurred on March 5, 2011 during a storm with sustained winds of over 30 m.p.h. and wind gusts up to 43 m.p.h.  *See id.* at 38:15–17, 39:22–40:5; Pltf. Ex. 59 at 5 (weather data, including wind speed, in five minute increments from March 5, 2011 for Freeport, Texas).  Fitzgerald—the PCL superintendent on site at the time—explained the normal PCL practice for checking the weather as "[u]sually it's your own accord to listen to the weather or pull it up on the Internet if there's a suspected front . . . [or if] it's already raining [y]ou would go to the office or call somebody at the office and say, How long is this here for? What's it going to do? What's the forecast?"  Fitzgerald Dep. at 43:25–44:5.  Prior to the breakaway, Fitzgerald did not check the weather forecast himself, call the office to ask about the weather, nor receive any warning of the incoming storm from anyone else at PCL.  *Id.* at 43:11–17, 44:6–19.  He described the weather at the time of the breakaway as "very, very windy, gusts . . . cloudy; and I believe it [had] started to sprinkle rain."  *Id.* at 39:22–40:1.  PCL "did nothing specific" to change or strengthen any of the barge moorings despite the pending storm.  *See* Grady Dep. at 35:24–36:2.

Graham's expert, Sanborn, testified that—in contrast to PCL's response to the pending storm—"the standard is somebody looks at the weather every day—every morning, and then determines, you know, wind velocity, river flow and so

forth . . . [and] if there's a strong wind coming . . . they send out boats to . . . go beyond the normal checking to check the lines and moorings to make sure they're adequate, and if necessary, put out extra rigging to make sure that the equipment stays moored." Sanborn Tr. at 22:11–21.

During the stormy conditions, shortly after 10:30 a.m, one of the mooring lines for Barge 8208 broke.  *See* Pltf. Ex. 60 at 8; Fitzgerald Dep. at 38:15–39:1, 41:24–42:3.  Fitzgerald was working in the area at the time and saw that the barge had broken free at one end.  Fitzgerald Dep. at 38:20–39:7.  He called another PCL employee, who attempted to use a skiff with an outboard motor to try to push the barge back into place.  *See id.* at 40:9–15; Pltf. Ex. 60 at 8.  Despite their efforts, the mooring line at the other end of the barge also broke and Barge 8208, along with Barge 304 that was tied up to it, began to drift together down river.  *See* Pltf. Exs. 60 at 8; 101 at 1.

Other PCL employees and a tug service were called in to help, but were not able to stop the barges before the bow of Barge 8028 hit the ANGELA C, which was receiving fuel and ice at the dock.  *See* Pltf. Exs. 60 at 5–8; 101 at 1–5.  After eventually controlling the barges with a tug boat, PCL moored the barges with steel cables rather than the two-inch ropes and implemented a formal daily mooring inspection program.  Grady Dep. 56:14–19; *see* Pltf. Ex. 61 at 1–2.

After being hit by the barge, the ANGELA C started to take on water through the hole in its starboard side.  Graham Tr. Vol. 1 at 14:1–15:1; *see* Def. Ex. 18 (Figure 3 below).  The boat also sustained damages to its stabilizer, fuel tank, and exterior paint.  *Id.*  As soon as Graham made sure that his bilge pumps could address the water in the boat, he hired a marine carpenter to perform emergency repairs to patch the hole and a diver to be on call and inspect the hull for any additional damage.  *Id.* at 15:2–6, 16:9–17:1; *see* Pltf. Ex. 55 (photo of carpenter examining the hole in the ANGELA C).  Graham paid $1000 in total, $500 each to the carpenter and the diver, for these emergency services.  Graham Tr. Vol. 1 at 17:2–17.  He also paid $300 to one of his crew members for a personal injury he suffered as a result of the collision, and $3000 total, $1000 each, to his three crewmembers for living expenses while they were out of work.  *Id.* at 17:23–18:14.



**FIGURE 2.** The ANGELA C with damage from the collision.  Def. Ex. 18.

### D. Postcollision Settlement and Repairs

Soon after the incident, someone from PCL spoke with Graham and assured him that PCL would pay for his damages. *See id.* at 18:24–19:7. Graham's surveyor conducted an initial survey of the damage to Graham's vessel on March 7, 2011, and Graham's PCL's surveyors conducted a joint survey on March 15, 2011. *See* Pltf. Exs. 1, 2. On March 23, 2011, Graham's surveyors made a claim on his behalf to PCL for damage to his vessel and loss of income, but did not specify the amount being claimed. *See* Def. Exs. 1, 2. On March 31, 2011, Graham obtained a repair estimate of $147,500 from Baron's shipyard. *See* Def. Ex. 5. Around this time, PCL's insurance carrier tried to settle Graham's claim by making a "total loss" offer of $85,000, which they represented as his boat's value. *See* Def. Ex. 4 at 6; Graham Tr. Vol. 1 at 26:23–27:1; 27:14–23.

After rejecting PCL's total loss offer, Graham decided it was necessary to hire a lawyer on April 11, 2011. *See* Graham Tr. Vol. 1 at 28:1–3; Pltf. Ex. 4. It is not clear whether Graham made a claim or provided survey estimates to PCL for any specific amount of property damage or lost profits before hiring his lawyer. *See* Graham Tr. Vol. 2 at 18:24–19:15, 20:15–22; Pltf. Ex. 68 at 6. On April 12, 2011, Graham's lawyer stated that Graham's repairs were estimated to be around $150,000 and that his lost income was in excess of $1,500 per day, but two days later he clarified he did not yet have an accurate assessment of lost profits. *See id.*;

Pltf. Ex. 5 at 3.   The resolution of the repair claim was delayed because of a dispute over whether to use estimates for fiberglass or wooden repairs.  Def. Ex. 7 at 3.

In mid-May 2011, PCL and Graham agreed to a partial settlement of $158,375 for the portion of Graham's claim concerning repair and storage costs. Def. Ex. 9 at 1, 4, 5.  However, the parties were unable to reach an agreement on lost profits.  *Id.* at 3–6.

The delay of the settlement for repair costs made it more difficult for Graham to obtain repairs to the ANGELA C.  Baron's shipyard provided its original repair estimate in March, but by late May when Graham was able to pay for repairs, the shipyard was busy with other vessels and was not able to start repairs or tell Graham when they would be able to start.   Graham Tr. Vol. 1 at 62:15–22. Graham's other repair options were limited, as there are very few places in the are with the ability to repair large wooden vessels.  *Id.* at 63:2–7.  Graham hired a marine carpenter who began to undertake the repairs, but who had to leave when the shrimping season started.  *Id.* at 62:23–63:13.  At that point, Graham testified, he was left with no choice but to undertake the remaining repairs himself.  *Id.* at 63:16–23.  Graham ultimately spent over $160,000 in repairs, not including storage costs.  Graham Tr. Vol. 2 at 10:17–23.

### III.   CONCLUSIONS OF LAW

### A. Compensatory Damages

#### 1.   Lost Profits

Graham seeks lost fishing profits for the period of time during which the ANGELA C was inoperable due to the collision.  The parties agree he is entitled to any lost profits that are "reasonably certain," but produce widely divergent values based on their proposed models.  *Compare* Docket Entry No. 73 ¶¶ 167–76, 236 (PCL's calculations of lost profits as $0), *with* Docket Entry No. 74 at 33 (Graham's calculations of lost profits as $220,408.03).  The Court concludes that a reasonably certain calculation of Graham's lost profits includes some elements of each party's model.

Plaintiffs in maritime cases may recover lost profits resulting from the loss of use of a vessel by proving "the amount of such profits . . . with reasonable certainty."  *Skou v. United States*, 478 F.2d 343, 345 (5th Cir. 1973) (internal quotation marks omitted) (quoting *The Conqueror*, 166 U.S. 110, 115 (1897)).  In commercial cases, this usually involves a showing "that a vessel 'has been engaged, or was capable of being engaged in a profitable commerce.'"  *In re M/V Nicole Trahan*, 10 F.3d 1190, 1194 (5th Cir. 1994) (quoting *The Conqueror*, 166 U.S. at 133).  That is, something more than "the simple fact that the vessel was laid up for repairs must be shown—a market for the vessel must be shown."  *Canal*

*Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000) (internal quotation marks omitted) (quoting *In re M/V Nicole Trahan*, 10 F.3d at 1194). However, reasonable certainty does not require that lost profits "be proven specifically" or even with "substantial" certainty because this would "impose an onerous burden" on the plaintiff; rather, "the issue is whether profits may be reasonably supposed to have been lost." *In re M/V Nicole Trahan*, 10 F.3d at 1194; *Canal Barge*, 220 F.3d at 379.

Lost profits during a repair period can be determined by "'a simple calculation based upon the number of days the [vessel] was out of service . . . multiplied by the average daily lost profits for the vessel.' From this gross figure must be subtracted the ordinary expenses the shipowner would incur in operating his vessel to ascertain the owner's net profit." *McKinney v. Grace Distribution Servs., Inc.*, 660 F. Supp. 1092, 1095 (S.D. Miss. 1986) (quoting *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1002 (5th Cir. 1984)). Daily lost profits can be estimated from "a fair average based on a number of voyages before and after." *In re M/V Nicole Trahan*, 10 F.3d at 1194; *see, e.g.*, *Canal Barge*, 220 F.3d at 379–80 (affirming an award of lost profits based on credible testimony that the damaged barge would have been used at full capacity if not for the repairs and "that the historical profitability of the barge was $502/day").

### a.  Graham's Fishing Business and Quota

From January 10, 2011, when Graham purchased ice for his first trip of the season, until March 5, 2011, when his boat was struck while preparing to leave for his next trip, Graham had a total fish catch of $100,522.50, after dock and cost recovery fees, as demonstrated by his sales receipts.  *See* Pltf. Ex. 109 at 1–10 (sales receipts from this time period); Docket Entry No. 74 ¶¶ 57–59, Ex. A (spreadsheets summarizing the sales receipts).  Graham testified that based on this profitable start, 2011 was on track to be a "record season."  Graham Tr. Vol. 1 at 43:6.

In addition to documentation showing his income during the relevant time period, Graham also introduced into evidence receipts and handwritten records to show that his operating expenses for crew share, fuel, ice, groceries, and bait during this time period were $43,574, or 43.3% of his fishing income.  *See* Pltf. Ex. 109 at 11–23; Docket Entry No. 74 ¶ 72.  Graham paid his crew in cash and testified that he did not have a formal recordkeeping system for expenses.  *See* Pltf. Ex. 109 at 11–23; Graham Tr. Vol. 1 at 50:7–17; 89:16–23 ("I'm not a sharp bookkeeper.")

Graham's historical financials paint a less profitable picture.  Graham acknowledged that his tax returns from 2008–2012 accurately depict his fishing expenses and income.  Graham Tr. Vol. 1 at 100:15–17.  Those returns show that

he had an average net annual fishing income of $8,072 from 2008–2010 and 2012, significantly lower than the amount he is claiming in lost profits.  Taking into account the daily operating expenses (fuel, food, bait, ice, and crew shares) listed in his tax returns, the Court calculates that Graham's average ratio of daily operating expenses to gross fishing income in his tax returns was 73.6% from 2008–2012.  *See* Table, *Operating Expenses from Graham's Tax Returns, 2008–2012*, Appendix to this Opinion; *see also* Def. Exs. 12–16.

The analysis of Graham's estimated lost profits is complicated by a quota system that regulates the number of red snapper he is allowed to catch.  Since 2007, the Gulf of Mexico Red Snapper Fishery has been regulated under an Individual Fishing Quota (IFQ) system, which allocates percentage shares or "quota" of the total allowable catch to individual fishermen.  *See* Gulf Red Snapper Individual Fishing Quota (IFQ) Program, 50 C.F.R. § 622.21; Gulf of Mexico Fishery Management Council, *Red Snapper Individual Fishing Quota Program 5-year Review* (April 2013), National Oceanic and Atmospheric Administration (NOAA) Award No. NA10NMF4410011 at 8–9, *available at* http://www.gulfcouncil.org/docs/amendments/Red%20Snapper%205-year%20Review%20FINAL.pdf.  Guindon explained that the IFQ system is accomplishing its goal of restoring the overfished Gulf of Mexico Red Snapper Fishery—the total allowable catch, and thus each fisherman's quota, has increased

due to the rebounding fishery. *See* Guindon Tr. at 29:6–30:9. The IFQ system has also increased profitability and stability for red snapper fishermen, as it allows quota holders to catch a known quantity of snapper throughout the entire year rather than compete in a "race" to fish during a short fishing season. *Id.* Fishing quota can be traded or leased between fishermen. 50 C.F.R. § 622.21(6); *see, e.g.*, Guindon Tr. at 27:12–14; Graham Tr. Vol. 1 at 105:15–22.

In the 2011 season, Graham had 30,000 pounds of his own snapper quota and the ability to fish for an additional 190,000 pounds of leased quota. *See* Graham Tr. Vol. 1 at 55:1–7; Docket Entry No. 74 ¶¶ 63, 65. At the time of the collision, Graham had used 33,558 pounds of his total available quota of 220,000 pounds, including 6,646 pounds of his own quota and 26,912 pounds of leased quota. *See* Pltf. Ex. 109 at 1–10; Docket Entry No. 74 ¶¶ 66, 68, Ex. A. In early 2011, he received $4.25 per pound of red snapper caught under his own quota and $1.25 per pound caught under the leased quota (the difference goes to the owner of the quota), for a composite price of $1.84. *See* Pltf. Ex. 109 at 1–10; Docket Entry No. 74 ¶ 67, Ex. A. Graham convincingly demonstrated that his remaining quota would have allowed him to continue fishing at a similar rate and value of catch throughout 2011—at his precollision average of 621 pounds of quota per day, his remaining 186,442 pounds of available quota would allow an additional 300 days of fishing. *See* Docket Entry No. 74 ¶¶ 67–71. Graham's boat and method of

fishing were designed to catch red snapper in addition to other reef fish that are not part of the quota system.[2]  *See* Graham Tr. Vol. 1 at 46:9–24; 51:12–52:2.

### b.  Graham's Proposed Lost Profits Model

Graham's lost profit model is based on his estimated daily profits in early 2011 prior to the collision.  Guindon corroborated Graham's testimony that 2011 was a particularly good year in the snapper fishery, explaining that the recently enacted federal quota system for red snapper had stabilized the fishery and the 2010 BP oil spill had led many fishermen to engage in other work (like cleanup efforts) so "the people that actually participated in the fishery did very well that year."  Guindon Tr. at 15:22–16:12.  In contrast to his fishing income from early 2011, Graham's fishing performance in late 2011 (after he was able to return to fishing) does not provide an accurate indication of his potential daily profits, he argues, because he had numerous lingering problems with his vessel and did not have as much quota available because he lost the ability to lease some quota and he had to sell some of his own quota.  *See* Docket Entry No. 74 ¶¶ 87, 114.

---

[2] Graham's total catch value from early 2011 includes $19,656 of red snapper seized by the government due to Graham's failure to properly follow reporting requirements for his allocated red snapper quota.  *See id.* at 37:9–21; Docket Entry No. 74 ¶ 59.  Although Graham did not actually receive those funds, the amount should be included in reasonably estimating Graham's lost profits during the time that the ANGELA C was unable to fish because it demonstrates his rate of catching fish in early 2011 and it is unlikely that Graham would repeat this costly mistake again.  *See* Graham Tr. Vol. 1 at 37:16–38:12; Docket Entry No. 74 ¶¶ 60, 61.

Because 2011 was a relatively productive year and fish catch can vary significantly year-to-year, Graham's model extrapolates from his early 2011 profits rather than looking to averages from other years. *See* Guindon Tr. at 23:2–4 ("Every year is different, so looking at production year by year . . . would be a more accurate way of determining what his . . . catch might have been that year.") In addition, Graham's model is a "conservative" estimate, he says, because fish catch in the winter months is generally lower than the spring and summer months due to the weather. *See id.* at 15:13–21  (explaining that the winter months have "pretty rough weather" for fishing, the spring months have "better weather" and are "pretty good fishing months," and the summer months have "very nice" weather and are "the gravy time"); *see, e.g.*, Docket Entry No. 74 ¶ 79  (showing that the average daily fish catch in March–May 2011 of a comparable boat in the same fishery was 155% of its average daily catch during January and February 2011).

Graham argues that his tax returns do not provide the most reasonable basis for calculating his lost profits because fishing varies year-to-year, tax returns include both fixed and operating expenses, and many of his fixed expenses actually increased during the period the ANGELA C was idle.  Docket Entry No. 74 ¶¶ 84–86.

Graham calculates that his net fishing profit during the 54-day period from January 10 to March 5, 2011 was $56,947.53 and his daily profit was $1,054.58. *See* Docket Entry Nos. 74 ¶ 73; 74-1 at 5 (spreadsheet summarizing Graham's income, expenses, and profits from early 2011).   Multiplying this daily profit by 209—the number of days lost due to repairs—Graham concludes that his total lost profits are $220,408.03.  *See* Docket Entry Nos. 74 at 33; 74-1 at 5.

### c.  PCL's Proposed Lost Profits Model

Relying on statements from Graham that there are "no averages" in the fishing business and fishing is "feast or famine," PCL argues that Graham failed to meet his burden of proving the amount of his lost profits with reasonable certainty. *See* Docket Entry No. 73 ¶¶ 104, 105, 167.  In particular, PCL highlights that while Graham introduced exhibits showing bait, ice, fuel, and grocery expenses in early 2011, there was no testimony or other evidence to show that those receipts represent all of his operating expenses prior to the breakaway in 2011. *Id.* ¶¶ 168– 73.   Without this, PCL contends, it is impossible to determine how profitable Graham was through March 5, 2011—which is the entire basis for Graham's damage model. *Id.* ¶¶ 174–75.  Thus, given the uncertainty in the fishing industry and Graham's failure to present credible evidence to establish his profits during early 2011, PCL concludes that Graham should be awarded $0 for lost profits. *Id.* ¶¶ 176, 236.

Alternatively, PCL argues, even if Graham's lost profits can be calculated with reasonable certainty, his tax returns should provide the basis for the calculation because they severely undercut the reliability of the amount he is seeking. *Id.* ¶¶ 177–83. Based on Graham's tax returns from 2008, 2009, 2010, and 2012—the years for which he fished on the ANGELA C, leaving out the year in which the incident occurred—PCL makes a "conservative" calculation that Graham's average annual profit was $8,072.[3] *See id.* ¶ 178, 179; Def. Exs. 12 at 5; 13 at 7; 14 at 6; 16 at 1, 7. In 2011—the year of the incident—PCL calculates that Graham incurred a net loss of $10,416 from fishing, after adjusting for attorney's fees and boat storage expenses. *See* Docket Entry No. 73 ¶ 180, n.3; Def. Ex. 15 at 7, 12. Since Graham did not provide a credible explanation of the vast difference between his actual income in other years and what he projects he would have earned in 2011, PCL asserts that $18,488—the difference between his net income in 2011 and his average annual income for the other years on the ANGELA C—is a more reliable estimate of Graham's lost profits. *Id.* ¶¶ 182–83.

Finally, PCL argues that Graham failed to mitigate his damages by not seeking alternate employment during the approximate seven month period that the ANGELA C was inoperable. *Id.* ¶ 223; *see Gideon v. Johns-Manville Sales Corp.*,

---

[3] PCL states that this average annual profit number is a "conservative calculation because it does not include $125,000 that Graham incurred in 2012 for the purchase of [additional] fish quotas." Docket Entry No. 73 ¶ 179.

761 F.2d 1129, 1139 (5th Cir. 1985) (holding that damages that a plaintiff can mitigate are not recoverable).   Relying on Graham's testimony that he could always find employment as a captain on someone else's ship within at least two weeks and could reasonably earn $5,000 per month as a captain, PCL calculates that Graham could have earned $32,500 over the seven month period.  *See* Docket Entry No. 73 ¶¶ 228, 2yeah29, 235.

### d.  The Court's Lost Profits Model

Despite the variable nature of fishing, Graham has convincingly shown that but for the collision and the resulting necessary repairs to his boat, he would have been commercially fishing and there would have been a market for his fish during this time period in mid-2011.  *See Canal Barge*, 220 F.3d at 379.  In arguing that Graham should be denied any recovery for lost profits, PCL seeks to impose too "onerous" of a burden on Graham, merely because of the inherent variability in the fishing industry.  *See In re M/V Nicole Trahan*, 10 F.3d at 1194; *Canal Barge*, 220 F.3d at 379.  The Court concludes that Graham's lost profits during the period his boat was being repaired can be determined with "reasonable" certainty by calculating his average daily profit, using his fishing income from early 2011 and the average expense ratio from his tax returns.  *See McKinney,* 660 F. Supp. at 1095.  Given the available evidence in the case as well as the testimony that gross fishing income is the main variable that changes from year to year for a fisherman,

whereas operating expenses as a percentage of income are less volatile, the Court determines that the most reasonable calculation of lost profits uses Graham's income from 2011 with his expense ratio from a range of five years.

To estimate Graham's lost profits, the Court uses a "simple calculation" of gross income minus operating expenses multiplied by the number of days the vessel was out of service.  *See McKinney,* 660 F. Supp. at 1095; *Delta S. S. Lines,* 747 F.2d at 1002.  In terms of income, Graham's sales receipts from early 2011 are thorough and credible and provide the most appropriate basis for estimating his daily gross income during the repair period.  Graham convincingly demonstrated that he would have had enough available quota to continue fishing at a comparable rate throughout the year.[4]   The evidence also demonstrated that fish catch is generally higher in the spring and summer months, therefore this is likely a conservative basis for determining Graham's lost income.

However, Graham's calculation of his operating expenses for early 2011, which shows expenses as 43.4% of income, is less credible.   The evidence

---

[4] The subsequent changes to Graham's available quota in 2011 after the incident complicate the lost profits analysis.  In particular, Graham's sale of 10,000 pounds of his own snapper quota could be seen as income that should be subtracted from his lost profits recovery.  On the other hand, Graham testified that because of the damages to his boat, he lost access to a significant amount of the quota he had been leasing, not only for the rest of 2010 but also into the future. Neither party directly addressed these issues; therefore the Court does not have evidence of specific numbers to account for these quota issues.  Because these quota issues likely affect Graham's income in opposite ways, the Court concludes that its lost profit award is one that is a reasonably certain without accounting for them.  And, as discussed above, the income calculation errs on the lower side because it does not increase Graham's income for the normal increase in catch that occurs during the spring and summer months.

provided to support this expense figure is less thorough and reliable than that provided for Graham's income during the same period.  In particular, Graham's testimony about his informal systems of payment for his crew and recordkeeping for his expenses did not convincingly demonstrate that his expense calculations represent all of his operating expenses for early 2011.  In addition to Graham's expense-side evidence being less comprehensive than that for his income, his testimony attempting to reconstruct his expenses is substantially undercut by his tax returns.  Those returns show a significantly higher ratio of daily operating expenses to income—73.6% (the average ratio over five years of tax returns).  The Court agrees with Graham that the tax returns should not provide the sole basis for determining Graham's lost profits in 2011, given the testimony that 2011 was a highly productive year, the credible evidence of Graham's income in early 2011 through sales receipts, and the fact that tax returns include more expenses than just normal operating expenses.  However, the Court concludes that the tax returns provide the most reliable estimate of Graham's operating expenses, by using the average ratio of operating expenses to income.

The following table summarizes the Court's calculations of Graham's lost profits:

**Graham's Lost Profits**

| | |
|---|---|
| Graham's Fishing Income (from fish sales receipts) 1/10/2011–3/4/2011 (54 days) | $100,522.50 |
| Estimated Expenses (using an average of 73.6% from Tax Returns[5]) | $73,984.56 |
| Net Profit after Expenses | $26,537.94 |
| Profit per day | $491.44/day |
| **Total Lost Profits** 3/5/2011–9/30/2011 (209 days) | **$102,710.96** |

Finally, PCL's failure to mitigate argument misses the mark because Graham testified that he could not have worked on someone else's boat during this time because he was trying to get his boat fixed, both by working on it himself and hiring a crew. *See* Graham Tr. Vol. 1 at 75:9–20. Graham ended up handling the repairs on his own as an option of last resort after his original surveyor was too busy with other clients, the carpenter he hired had to leave early for the shrimping season, and no one else was qualified or available to do the work. *Id.* at 61:5–11, 62:19–63:19. If Graham had not helped with the repairs, he might have prolonged the time the boat was out of service, which would have augmented rather than mitigated damages.

---

[5] *See* Table, *Operating Expenses from Graham's Tax Returns, 2008–2012*, Appendix to this Opinion.

The Court finds that PCL has not met its burden of showing that Graham's decision to stay and oversee the repairs to his unique wooden vessel was unreasonable.  *See Standard Marine Towing Servs., Inc. v. M.T. Dua Mar*, 708 F. Supp. 562, 569 (S.D.N.Y. 1989) (rejecting defendant's argument that a damages award should be reduced based on the failure to mitigate a barge captain's wages during the repair period because the barge captain's "presence was reasonably necessary to safeguard the barge and oversee repairs"); *see also Tidewater Marine, Inc., v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 1004–05 (E.D. La. 2000) (finding that defendant failed to show plaintiff's choice of a company to repair its boat was unreasonable because the evidence showed the decision was based on legitimate concerns about repair quality and potential delays).  Thus, the Court concludes that Graham did not fail to mitigate his damages.

## 2.  *Survey Fees*

A portion of Graham's expenditure for survey fees, as documented by an invoice, was reasonable and is recoverable.  *See* Pltf. Ex. 18.  The costs of marine surveys are allowed as damages under general maritime law to the extent they are reasonably necessary to determine the extent of the damages sustained to the owner's vessel.  *See Zanzibar Shipping, S. A. v. R.R. Locomotive Engine No. 2199*, 533 F. Supp. 392, 398 (S.D. Tex. 1982); *Genie-Lyn Ltd. v. Del. Marine Operators, Inc.*, 2006 WL 42169, at *29 (W.D. La. Jan. 3, 2006); *see also* Michael A. Snyder,

*Maritime Collision Damage to Vessels and Fixed Structures*, 72 TUL. L. REV. 881, 921 (1997).  However, work done by surveyors in planning or designing repair work or in anticipation of litigation is not an allowable expense.  *See Zanzibar Shipping*, 533 F. Supp. at 398; *Genie-Lyn*, 2006 WL 42169, at *29; Snyder, *supra* at 922–23.

Graham necessarily relied upon the surveyor to initially determine repair costs and the nature and extent of the damages to the ANGELA C.  The initial survey performed by Graham's surveyor and the joint survey with PCL's surveyor were both reasonably necessary to determine the extent of damages and are thus recoverable.  However, the work performed by the surveyor after March 30, 2011 is not recoverable because Graham had already received repair estimates by that date, based on the initial surveys.   In addition, the work descriptions in the surveyor's invoice indicate that after March 30, 2011 the hours billed were related to planning repair work or litigation, which are not recoverable expenses.  The Court calculates that 18 hours of work (the work completed prior to March 30, 2011), or 57.6% of the total hours billed by the surveyor, are recoverable as compensatory damages.  The invoice includes both an hourly rate and combined additional expenses, so the amount recoverable is 57.6% of the total amount billed—$2,931.69.

### 3. Emergency Repairs

Graham's expenditure of $1,000 for emergency repairs was reasonable given the urgency of the situation after his boat was struck, and is thus recoverable. *See Compania Punta Alta, S.A. v. Dalzell*, 162 F. Supp. 926, 931 (S.D.N.Y. 1958) (adopting the "reasonable person" standard expressed by Judge Learned Hand in *Pan-Am. Petroleum & Transp. Co. v. United States*, 27 F.2d 684 (2d Cir. 1928)); Snyder, *supra*, at 914 ("Recovery will be allowed for the cost of temporary repairs incurred in a reasonable belief of their necessity as judged, not by the victim, but by the objective standard of a reasonable person."). The amount of these emergency repairs is negligible compared to the amount required for full repair of the boat and such temporary repairs can often reduce the overall repair expense by preventing further damage. *See* Graham Tr. Vol. 1 at 16:9–23 (explaining that he hired a carpenter and a diver to perform emergency repairs and prevent any additional damage in order to be "on the safe side").

### 4. Crew Payments

Graham's payment of $300 to his crewmember for emergency medical services is reimbursable because Graham testified that it was his "obligation as a boat owner and operator to pay for the medical bills [of his] crew." *Id.* at 18:6–8; *see* Snyder, *supra*, at 913 (citing The Lisbon Rules 1987, 18 J. Mar. L. & Com. 577 (1987)) ("[T]he Claimant shall be entitled to recover as damages: . . .

(c) Reimbursement of sums, for which the Claimant has become legally liable and has paid to third parties in respect of such liability, arising out of the collision by reason of contractual, statutory or other legal obligations.")

On the other hand, Graham testified that he paid his three crewmembers $1,000 each while they were out of work due to the collision to help them with living expenses.  Graham Tr. Vol. 1 at 18:9–14.  While it was admirable for Graham to do "all [he] could do for [his crew]," Graham has not shown that he had any legal obligation to make this payment, which is required to recover this expense from PCL.  *See* Snyder, *supra*, at 913.  Therefore, Graham's payment of $3,000 to his crew is not recoverable.

## B. Punitive Damages

### 1. Liability for Punitive Damages

Punitive damages are "aimed not at compensation but principally at retribution and deterring harmful conduct."  *Exxon Shipping,* 554 U.S. at 492; *see Miles v. Melrose*, 882 F.2d 976, 989 (5th Cir. 1989).  To award punitive damages, the defendant must be guilty of "gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct."  *Miles*, 882 F.2d at 989 (internal quotation marks and citation omitted).  In *Exxon Shipping v. Baker*, the Supreme Court affirmed that punitive damages can be awarded in maritime cases for property damages resulting from a defendant's "reckless

action." *Exxon Shipping*, 554 U.S. at 511.  Recklessness, the Court explained, is

worse than negligence, but it "is not intentional or malicious, nor is it necessarily

callous toward the risk of harming others, as opposed to unheedful of it."  *Id.*

at 493 (citation omitted).  The Court looked to the Second Restatement's definition

of recklessness:

> Recklessness may consist of either of two different types of conduct.
> In one the actor knows, or has reason to know . . . of facts which
> create a high degree of risk of . . . harm to another, and deliberately
> proceeds to act, or to fail to act, in conscious disregard of, or
> indifference to, that risk. In the other the actor has such knowledge,
> or reason to know, of the facts, but does not realize or appreciate the
> high degree of risk involved, although a reasonable man in his
> position would do so.

*Id.* (quoting Restatement (Second) of Torts § 500 cmt. a (1965)); *see also*

Restatement (Third) of Torts: Phys. & Emot. Harm §2 (2010) ("A person acts

recklessly in engaging in conduct if: (a) the person knows of the risk of harm

created by the conduct or knows facts that make the risk obvious to another in the

person's situation, and (b) the precaution that would eliminate or reduce the risk

involves burdens that are so slight relative to the magnitude of the risk as to render

the person's failure to adopt the precaution a demonstration of the person's

indifference to risk.").

   In *Exxon Shipping*, the Supreme Court affirmed but lowered a jury award of

punitive damages based on the reckless conduct of an inebriated captain who

inexplicably "left the bridge and went down to his cabin" two minutes before a required turn of the tanker, which resulted in the accident that caused a disastrous oil spill.   *Exxon Shipping,* 554 U.S. at 477, 480.   Although holding that recklessness was sufficient for an award of punitive damages,[6] the Court reasoned that the amount of such an award should depend in part on where the defendant's conduct falls along a spectrum of varying degrees of fault because "cases of the most as well as the least blameworthy conduct trigge[r] punitive liability, from malice and avarice, down to recklessness, and even gross negligence." *Id.* at 512.

While not purporting to announce a new threshold for the award of punitive damages in maritime case, *Exxon Shipping* applied a lower standard than a number of district courts have previously applied in denying punitive damages in maritime property damages cases.   *Compare BP Exploration & Oil v. Moran*, 147 F. Supp. 2d 333, 345 (D. N.J. 2001) (denying punitive damages in a case arising from the collision of a tugboat into a dock facility while the employee on watch was asleep at the wheel because the conduct rose "only to the level of ordinary negligence" as it did not constitute "willful or wanton behavior"), *and Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 762–63 (E.D. La. 1989), *aff'd* 904 F.2d 317 (5th Cir. 1990) (denying punitive damages in a case involving barges that broke

---

[6] Although *Exxon Shipping* was a case of reckless conduct, the Court noted "the jury was not asked to consider the possibility of any degree of fault beyond the range of reckless conduct," thus leaving open the possibility that a jury could have found the behavior more blameworthy. 554 U.S. at 480 n.2.

away under tow due to inadequate rigging and high river conditions because it did not find that the company officials were "aware that [the captain] would proceed with an unsafe tow" or that the captain's conduct was as "egregious" as the word reckless might imply), *with Exxon Shipping,* 554 U.S. at 493 (explaining that reckless conduct need not be "intentional" nor does the defendant need to be aware of the high degree of risk involved if a reasonable person would be aware of it).  It is also a lower threshold than exists under the law of most states, a majority of which require either a finding of malice or of some conduct more egregious than gross negligence, such as "outrageous conduct" or "willful and wanton indifference to the safety of others."   *See* Lori S. Nugent et al., PUNITIVE DAMAGES: A STATE-BY-STATE GUIDE TO LAW AND PRACTICE § 3.3 (2012) (listing 12 states, including California, that require "proof of malice" and 25 states, including New York, that do require "proof of conduct more egregious than gross negligence but not requiring proof of malice").  Even Texas, which has retained the lesser "gross negligence" standard despite tort reform measures that have curtailed the reach of punitive damages in other respects (by, among other things, imposing caps and a heavier "clear and convincing" burden of proof), requires that a defendant have "actual, subjective awareness" of the extreme degree of risk.   Tex. Civ. Prac. & Rem. Code § 41.001(11) (West 2013).  While it establishes a lower threshold than exists under the law of Texas and most other states, the maritime

standard for punitive damages is not an outlier.  In addition to its support from the Restatement (Second) of Torts, which requires only that a defendant had "reason to know" of the high degree of risk, a punitive standard requiring only gross negligence or recklessness is used in other areas of federal law.  *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538–39 (1999) (clarifying that the punitive damages standard under Title VII does not require a finding of "egregious" or "outrageous" conduct).

These distinctions among the various standards for punitive damages may seem like fine and academic ones, but they have a practical consequence in this case.  The evidence certainly does not establish that PCL acted with malice, or even that its conduct was outrageous or showed wanton indifference to safety concerns.  Nor does the Court conclude that PCL had actual knowledge of the extreme degree of risk yet proceeded with conscious indifference to the safety of others.  But PCL did "not realize or appreciate the high degree of risk involved" when "a reasonable [company] in [its] position would do so."  *Exxon Shipping*, 554 U.S. at 493–94 (quoting Restatement (Second) of Torts § 500 cmt. a).  Furthermore, PCL's failure to take easily available precautions demonstrates an indifference to the magnitude of risks involved.  *See* Restatement (Third) of Torts: Phys. & Emot. Harm §2 (2010).  That satisfies the *Exxon Shipping* recklessness standard for awarding punitive damages in maritime property damage cases.  The

Court therefore concludes that PCL's conduct with regards to its inadequate moorings and weather preparations was reckless.

Multiple factors demonstrate PCL's recklessness. First, Sanborn's expert testimony established that H-beam pilings should only be used for temporary moorings, if at all, because it is foreseeable that two-inch ropes pulled against the "sharp" edges of H-beam pilings will abrade and ultimately break. In addition, PCL could have used many safer, easily available alternatives—thicker lines or steel cables, multiple lines around each piling, and/or rounded pilings.

Moreover, PCL's on-site supervisor, Greg Grady, only determined the moorings were adequate for a "short term" period in protected conditions with low wind. Thus, in the face of a pending storm with high winds, and after several weeks of using these same mooring lines on H-beam pilings, an experienced construction company like PCL should have reevaluated and reinforced the safety of its moorings. PCL's lack of an established protocol to check the weather and communicate about pending storms also demonstrates an indifference to safety.

Based on the evidence presented, the Court concludes that PCL, an experienced construction company, should have known there was a high risk of harm involved in inadequately mooring large, heavily weighted barges in a navigable waterway with other boats, people, and bridges nearby and a storm

pending.   In addition, PCL could have easily taken precautions to use safer moorings.

### 2. *Amount of Punitive Damages*

The fact that PCL's conduct falls on the lower end of the "punitive damages" culpability spectrum does influence the amount of the award.  PCL did not act with malice nor was its conduct motivated by a decision to place economic gain over reasonable safety measures.  *Exxon Shipping* cited these among the factors that should be considered in determining the amount of a punitive award.  *Exxon Shipping*, 554 U.S. at 493–95 (discussing factors such as "degrees of relative blameworthiness," actions taken to "augment profit," the difficulty in detecting the wrongdoing, and the "value of injury and the corresponding compensatory award").  That decision also reviewed the history and purposes of common law punitive damages awards as well as studies evaluating the average ratio of punitive to compensatory damages in various cases.  *See id.,* 554 U.S. at 490–515.  After its lengthy analysis, the Supreme Court determined that "a median ratio of punitive to compensatory damages of about 0.65:1 probably marks the line near which cases like this one largely should be grouped," and a 1:1 ratio is "a fair upper limit in such maritime cases."  *Id.* at 513 (citations omitted) (explaining that cases "like this one" are those "without intentional or malicious conduct, and without behavior driven primarily by desire for gain").

Applying the factors articulated in *Exxon Shipping* to this case, and balncing PCL's culpability at the low end of the spectrum against the relatively low award of compensatory damages,[7] the Court concludes that a punitive damages award of the median ratio—65% of compensatory damages—is the appropriate result.

## C. Attorney's Fees

The Court rejects Graham's request for attorney's fees based on PCL's alleged bad faith in its early negotiations and dealings with Graham after the collision.  Graham seeks attorney's fees of $38,000 for the period of time from the collision until the partial settlement for repairs and storage costs.

The Fifth Circuit has recognized a limited exception in maritime cases to the general American rule that attorney's fees are not recoverable by the prevailing party.  This exception allows federal courts to award attorney's fees "when the

---

[7] In calculating the ratio at .65:1, the Court is using as the denominator the lost profits and other compensatory damages awarded in this lawsuit.  It may be more appropriate to also include the repair and storage costs of $158,375, which were paid by agreement, in the denominator.  The Court inquired about this issue at the trial, and PCL's counsel responded that punitive ratios (such as those in statutory caps) are typically tied to the damages awarded at trial.  But there are two reasons it may make more sense to include both the trial damages and the settled amounts when determining the punitive ratio in this situation.  First, the very idea of tying punitive damages to compensatory damages is that the punitive award should have some degree of correlation with the harm resulting from the conduct.  *See Exxon Shipping,* 554 U.S. at 512*; cf. BMW N. Am. Inc. v. Gore*, 517 U.S. 559, 580 (1996) ("The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.  The principle that exemplary damages must be a 'reasonable relationship' to compensatory damages has a long pedigree.").  In this case, the repair costs are a major part of that harm.  Second, not including settled amounts in the punitive ratio could create a way for defendants that engaged in outrageous conduct to avoid significant punitive exposure by paying the compensatory claims before trial.  The punitive damages award in this case is far below even 50% when all of the economic harm caused by PCL is included in the ratio calculation.

losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Galveston Cnty. Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996) (internal quotation marks omitted) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)).  In such cases, however, the losing party's behavior must be "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent" to warrant an award of attorney's fees. *Id.* at 358 (quoting *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987).  An award of attorney's fees based on bad faith is not a tort remedy and has nothing to do with the merits of a claim or the underlying conduct. *Galveston Cnty.*, 92 F.3d at 358 (quoting *Guevara v. Mar. Overseas Corp.* 59 F.3d 1496, 1503 (5th Cir. 1995), *abrogated on a different issue by Atl. Sounding Co. v. Townsend*, 557 U.S. 404 (2009)).  Rather, an award of attorney's fees is meant to address abuses of the litigation process. *Id.*

This limited bad faith exception has generally been applied in maintenance and cure cases, which involve unique obligations owed to seamen. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 967–68 (E.D. La. 2011).  However, the Court need not decide the issue of whether the exception also applies to property damage cases, because it concludes that the facts do not warrant a finding of bad faith.

The evidence shows that PCL did not act in bad faith in assessing and dealing with Graham's claim.  For example, on the date of the incident, a PCL representative met with Graham and assured him that he would be paid.  *See* Graham Tr. Vol. 1 at 18:24–19:7.  Then, within ten days of the incident, PCL's surveyors and Graham's surveyors held a joint survey to evaluate the damage to the ANGELA C.  *See generally* Pltf. Ex. 2.  Around that time, PCL also offered to settle Graham's claim as a "total loss" by paying him $85,000.  *See* Def. Ex. 4 at 6.  Graham rejected the offer and, without making a counteroffer, decided to hire his lawyer.  *See* Graham Tr. Vol. 1 at 27:14–23, 28:1–3.  Graham did not obtain repair estimates until March 31, 2011, which is ten days before he hired his lawyer, and it is disputed whether Graham or his surveyors provided these estimates to PCL before Graham hired a lawyer.  *See* Def. Exs. 5, 6; Graham Tr. Vol. 2 at 20:15–22, 18:24–19:15.  Finally, on May 11, 2011, PCL offered to pay Graham $241,649.50 to settle all claims related to the incident.  *See* Pltf. Ex. 23.

The evidence shows that PCL was trying to address Graham's concerns, but that the parties disagreed about the damages.  PCL did not have to accept Graham's loss figures.  In addition, the alleged "vexatious" conduct did not occur during the litigation process, which is the typical situation in which courts have applied this limited exception to the normal fee rule.  *See Galveston Cnty.*, 92 F.3d at 358.  Attorney's fees will not be awarded.

IV.   CONCLUSION

For the reasons stated above, the Court finds and concludes as follows:

- Graham is entitled to total compensatory damages of $106,942.65—
  including $102,710.96 for lost profits, $2,931.69 for survey fees,
  $1,000 for temporary repairs, and $300 for crew medical expenses;

- Punitive damages of $69,512.72 are awarded to Graham based on
  PCL's reckless conduct, equal to 65% of compensatory damages; and

- Graham's claim for attorney's fees is dismissed.

Final judgment will be entered by separate order.

**SIGNED** this 23rd day of December, 2013.

_____
Gregg Costa
United States District Judge

**APPENDIX**

## Operating Expenses from Graham's Tax Returns, 2008-2012

| Year | Gross Fishing Income (after paying % to Quota Owner) | Total Fishing Expenses | Operating Expenses | | Operating Expenses as % of Gross Fishing Income |
|---|---|---|---|---|---|
| 2008 | ($492,015 -$181,880) **$310,135** | $435,554 | Boat Fuel | 33,081 | **76.3%** |
| | | | Food for Crew | 12,161 | |
| | | | Bait & Tackle | 38,680 | |
| | | | Ice | 12,509 | |
| | | | Crew Shares | 140,189 | |
| | | | **Total** | **$236,620** | |
| 2009 | **$137,299** | $123,403 | Boat Fuel | 10,611 | **52.6%** |
| | | | Food for Crew | 4,803 | |
| | | | Bait & Tackle | 10,983 | |
| | | | Ice | 6,876 | |
| | | | Crew Shares | 38,941 | |
| | | | **Total** | **$72,214** | |
| 2010 | ($473,454 -$31,000) **$442,454** | $473,702 | Boat Fuel | 138,080 | **74.7%** |
| | | | Food for Crew | 14,748 | |
| | | | Bait & Tackle | 13,321 | |
| | | | Ice | 8,500 | |
| | | | Crew Shares | 155,708 | |
| | | | **Total** | **$330,357** | |
| 2011 | **$153,089** | $211,505 | Boat Fuel | 31,332 | **81.2%** |
| | | | Food for Crew | 7,794 | |
| | | | Bait & Tackle | 9,312 | |
| | | | Ice | 9,822 | |
| | | | Crew Shares | 66,062 | |
| | | | **Total** | **$124,322** | |
| 2012 | **$456,894** | $593,006 | Boat Fuel | 61,606 | **83.4%** |
| | | | Food for Crew | 11,790 | |
| | | | Bait & Tackle | 23,280 | |
| | | | Ice | 10,429 | |
| | | | Crew Shares | 274,137 | |
| | | | **Total** | **$381,242** | |
| | | | **Average % Operating Expenses/ Gross Fishing Income 2008-2012** | | **73.6%** |